177 So. 636

**FIRST NAT. BANK OF OPP v. WISE et al.**

4 Div. 961.

Supreme Court of Alabama.

Dec. 16, 1937.

Rowe & Rowe, of Elba, and Mulkey & Mulkey, of Geneva, for appellant.

**BROWN, Justice.**

This appeal is from an interlocutory decree overruling the defendant's demurrer to the bill. The bill is filed by the widow and heirs at law of P. T. Wise, deceased, some of whom are minors, the personal representatives of said Wise joining therein, against the defendant mortgagee for an accounting, discovery, and relief.

While the bill is not artfully drawn, it avers that said P. T. Wise died on the 28th day of December, 1930, and at the time of his death was indebted to the defendant in the sum of $2,300, evidenced by note and secured by mortgage on the 400-acre farm of said Wise, of the value of from $12,000 to $16,000, and personal property consisting of "9 mules, 400 bushels of corn; 9 tons of hay; 3 two-horse wagons; one mower and rake; one cane mill and pan; one Ford car; one Ford truck; one ton of seed peanuts; 7 bales of cotton seed; one cow and calf; one sow and 4 pigs; one compost drill; one stalk cutter; 3 cotton planters; 5 droppers; one jersey wagon and a number of other plow tools and harness, consisting of plow stocks, plows and other equipment," of the value of $2,500.

That "respondent immediately after the death of the said P. T. Wise, and before any administration was had on his estate and without conferring with complainants, seized all of the personal property posted notice for five days, offered for sale part of said property at Elba, Alabama, in bulk and because [became] the purchaser of all the property offered for sale for the sum of six or seven hundred dollars; that said property was some fifteen miles from the place of the sale; that the lands were likewise sold in bulk at and for the sum of $1800.00. * * * That the fair market value of said personal property greatly exceeded the amount of the bid by respondent at foreclosure sale; that the fair and reasonable market value of the real estate greatly exceeded the respondent's bid at said foreclosure sale."

The bill also avers that the said Wise had been dealing with the respondent bank for several years; that he was unlearned and depended on the bank and its officers to keep the accounts between them; that he had made respondent payments in money and the delivery of farm products to apply on his debts; that the alleged mortgage was a renewal, and that complainants have no way of ascertaining the true state of the accounts; that the statement furnished by the respondent on the request of some of the complainants is not correct but is excessive; that though the debt was only $2,300, the bank after the seizure and sale of the personal property still claim $3,000 to be due it.

That the personal property was more than sufficient to pay the liability, that said "sale was made for the purpose of oppression and the acts of said bank in so foreclosing said mortgage was fraudulent and made for the purpose of oppressing these complainants and depriving them of their rights as heirs and distributees of the said Wise." Complainants offer to do equity.

The specific prayer of the bill is: "That the sale of the personal property be held for naught and that the said Bank be charged with the reasonable fair cash market value of said property at the time they took or converted the same, and that it

be ascertained and determined the amount due said Bank after deducting the value of said personal property, and that they be allowed to redeem said lands if there is found to be anything due on said mortgage." The bill also prays for general relief.

Looking at the allegations of the bill in the light of the special prayer, it appears with certainty to a common intent, that it seeks to have the value of the personal property seized by the mortgagee credited on the mortgage debt and a recovery of the real estate, in equity, for the benefit of the deceased mortgagor's estate, the widow, and the lawful distributee thereof.

■ The objection that there is a misjoinder of parties complainant, therefore, is not well taken. The widow and the heirs as well as the administrators have a common interest in having the mortgage debt satisfied by the application of the value of the personal property to its discharge. Randolph et al. v. Vails et al., 180 Ala. 82, 60 So. 159, 162.

■ It is not of material importance whether the sale of the personal property, under the circumstances, was void or merely voidable, as the filing of the bill is a direct attack upon the irregular and oppressive foreclosure. Chenault v. Milan, 205 Ala. 310, 87 So. 537; Marsh et al. v. Elba Bank & Trust Co., 207 Ala. 553, 93 So. 604; Id., Third Appeal, 221 Ala. 683, 130 So. 323; Cogburn et al. v. Callier et al., 213 Ala. 46, 104 So. 330; Fowler v. Fowler, 219 Ala. 453, 122 So. 440.

■ The general rule in respect to the sale of real property under the power of sale in a mortgage is that:

" 'Where the price realized at the sale is so inadequate as to shock the conscience, it may itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside.' 27 Cyc. 1508.

"And, although mere inadequacy of price is not sufficient to that end, it is 'always a circumstance to be considered in connection with other grounds of objection to the sale, and will be sufficient to justify setting the sale aside, when coupled with any other circumstances showing unfairness, misconduct, fraud, or even stupid management, resulting in the sacrifice of the property.' * * * The remedial action of courts in such cases is grounded upon the duty of the mortgagee, as stated by Shaw, C. J., in Howard v. Ames, 3 Metc. (Mass.) [308] 311: 'In executing such power, he becomes the trustee of the debtor, and is bound to act bona fide, and to adopt all reasonable modes of proceeding, in order to render the sale most beneficial to the debtor.' " Hayden v. Smith, 216 Ala. 428, 113 So. 293, 295; Hunter-Benn & Co. Company v. Bassett Lumber Co., 224 Ala. 215, 139 So. 348. See, also, Dewberry v. Bank of Standing Rock, 227 Ala. 484, 150 So. 463; Note, 69 A.L.R. 1194.

■ If the averments of the bill are true, and they must be so treated, the personal property was sold at less than one-third of its value, and the real estate at not exceeding 12 per cent. of its value, and under the authorities last above cited the complainants, unless they have been guilty of laches, which bars their right, were entitled to have the sale set aside and annulled.

The appellant's contention here is that it appears that the bill was filed more than 2 years after the alleged foreclosure of the mortgage, and that complainants are barred by their laches from seeking relief, notwithstanding some are minors, and cite, as conclusive of this contention, Canty v. Bixler et al., 185 Ala. 109, 64 So. 583, 585. That was what the court has referred to in numerous decisions "As the ordinary case" where the mortgagee purchases at the foreclosure without being authorized in the mortgage to do so, and the bill is to disaffirm the sale on that ground. In that case it was observed: "It is true that the bill in this case does attempt to show an extraordinary case, in which the two years of judicial limitation should not apply, but we concur with the chancellor that it fails so to do. Neither the mortgagor nor the mortgagee is a party to this suit; the proceeding is wholly between parties who have acquired their rights by inheritance; some of them through two generations, and other parties who have acquired their rights by contract, sale, and purchase. While it affirmatively appears that the mortgagor is dead, it does not clearly appear when he died—whether before or after the foreclosure. It does appear, however, that plaintiff's mother was living when the foreclosure was had, and that the complainant had no interest in the land at that time."

In the instant case the bill avers that the mortgagor died December 28, 1930, and left surviving, among others, as his heirs at law, Julia Wise, Pete Wise, Nancy Wise, and Velma Wise, minors, who sue by their next friend, etc., and that the property was sold immediately after the mortgagor's death.

The bill was filed April 15, 1935, 4 years and 3 months after the death of the mortgagor.

It is well settled that the doctrine of laches is not a hidebound rule like a statute of limitations, prescribed by the lawmaking power, but is a creature of courts of equity, founded upon common sense and natural justice. While the courts in the application of the rule are sensitive to the economic and business interest, the certainty of contracts, and the stability of titles, nevertheless, they recognize the fact that their major business, the cause which gave them birth, and necessitates their continued existence, is the administration of justice, by relieving from the effects of fraud, imposition, and oppression of the weak by the strong, and to prevent what is sometimes denominated "theft within the law."

In the "ordinary case," such as Canty v. Bixler, supra, by analogy, to the time allowed for statutory redemption, the decisions fix 2 years as reasonable time for a mortgagor to elect to disaffirm the sale, and, until disaffirmed, the foreclosure stands, and cuts off the equity of redemption. Alexander v. Hill, 88 Ala. 487, 7 So. 238, 16 Am.St.Rep. 55. But as to infant heirs of the mortgagor, if the mortgagor was dead at the time the sale was made, they are, by analogy, allowed 2 years after they attain their majority, provided 2 years does not extend the time beyond 20 years from the date of the sale. Lovelace v. Hutchinson, 106 Ala. 417, 17 So. 623; Alexander v. Hill, supra.

No better statement of the rule can be found than that by Brickell, C. J., in Norton et al. v. British American Mortgage Co., 113 Ala. 110, 117, 20 So. 968, 970: "What is a reasonable time in which the election to avoid the sale must be manifested, it was held in Ezzell v. Watson, 83 Ala. 120, 3 So. 309, was two years, by way of analogy to the time fixed by the statute for the exercise of the statutory right of redemption. But it was said by the court: 'This limitation of

two years is prima facie applicable, where no peculiar features mark the case, but may be shown to be unreasonably short, by proof of facts which render its application inequitable and unjust.' In Alexander v. Hill, 88 Ala. 487, 488, 7 So. 238 [16 Am.St.Rep. 55], there was an extended discussion of the rule, and it was said the limitation was not statutory, but judicial; that it was 'not the result of legislative mandate, but of judicial opinion; that such period is usually a reasonable time for the exercise of the option of affirmance or disaffirmance, with which a purchaser at his own sale arms the mortgagor. The basis of the doctrine is laches, and not staleness of demand. The sale cuts off the equity of redemption, as long as it is permitted to stand, but leaves in the mortgagor, and those claiming under him, the right to disaffirm it, and the consequent right to redeem upon such disaffirmance. But the law requires diligence of the mortgagor in the assertion of this right, and, in the absence of special circumstances, holds him to have waived the right, and to have affirmed the sale, unless he elects to the contrary within two years. *The whole theory of the limitation, therefore, rests on the presumption of ratification after the lapse of two years, in "ordinary cases." In extraordinary cases—cases involving peculiar circumstances, which rebut the presumption—it will not be indulged.'"* (Italics supplied.)

It is a familiar law that fraud vitiates every transaction into which it enters, at the instance of the party affected thereby, even a foreclosure in equity. Eslava v. Eslava, 50 Ala. 32; Dunklin v. Harvey, 56 Ala. 177. Therefore a foreclosure under the power of sale infected with fraud does not cut off the equity of redemption, and the mortgagor or those succeeding to his rights by operation of law have a reasonable time, to be determined by the court in the light of the circumstances, in the particular case, to assert and protect such right in a court of equity. As observed in Randolph v. Vails, supra: "In such instances the reasonable time within which the heirs must act must, of course, depend upon the situation of the parties and the circumstances of the particular case." This particular doctrine was reaffirmed in Marsh et al. v. Elba Bank & Trust Co. et al., supra. The bill in that case was filed after a lapse

of more than 3¼ years, and was sustained against the claim that complainants were guilty of laches.

It is also familiar law that where a grantee of real property has acquired the title thereto through fraud it may be recovered in equity on a bill filed within 10 years. Davis v. Harris et al., 211 Ala. 679, 101 So. 458; Prowell v. Wilson, 219 Ala. 645, 123 So. 38; Washington v. Norwood, 128 Ala. 383, 30 So. 405.

In Randolph v. Vails, supra, the court seriously debated the question whether or not the bill in that case could be sustained after a lapse of 9 years, and it was held, because of the intervening rights of third parties, that the doctrine of laches would be applied.

In Harmon v. Dothan Nat. Bank, 186 Ala. 360, 64 So. 621, it was held by a divided court that, where chattels covered by mortgage had been dealt with under circumstances that would constitute a tortious conversion, but for the relation of mortgagor and mortgagee, the mortgagor could not maintain trover or trespass at law, but all agreed that, in the circumstances, a court of equity, had its jurisdiction been invoked, would have granted relief.

We repeat the utterances of the court speaking through Brickell, C. J., in Norton's Case: "In extraordinary cases— cases involving peculiar circumstances, which rebut the presumption—[of ratification] it will not be indulged."

What are the circumstances of the particular case which rebuts the presumption of ratification? The mortgagor had been dealing with the mortgagee through a number of years, depending on the bank to keep the accounts and enter credits for payments made and property delivered to be applied to the mortgage debt, under circumstances creating a relation of trust and confidence; the mortgagor died leaving a valuable farm of 400 acres and personal assets and equipment amply sufficient to carry on the farming operation; immediately upon his death the mortgagee seized all the personal property of value sufficient to pay the debt, and, without consulting the survivors, before a personal representative could be appointed, sold part of it in bulk away from its location, under circumstances that would not invite competitive bidding, and purchased the lot at less than one-third of the value; sold the land worth from $12,000 to $16,000, and purchased it at less than one-eighth of its value; verily a "breaking up process" and in equity, as to the chattels, was tantamount to a conversion.

To apply the presumption of ratification in such circumstances, would be strained, unreasonable, and unwarranted; would encourage cupidity, and result in the condonation of fraud and oppression. We are of opinion, therefore, that the bill in this case was seasonably filed, and the court ruled correctly in overruling the demurrer to the bill.

Affirmed.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.